# IN THE DISTRICT COURT OF THE UNITED STATES

## FOR THE DISTRICT OF NEW MEXICO

FILED

UNITED STATES DISTRICT COURT
ALBUQUERQUE. NEW MEXICO

SEP 16 2004

CLERK

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| vs. | ) CRIMINAL NO. CR 03-1941 JC |
| MISSISSIPPI POTASH, INC. | ) |
| Defendant. | ) |

## PLEA AGREEMENT

Pursuant to Rule 11, Fed. R. Crim. P., the parties hereby notify the Court of the following

agreement between the United States Attorney for the District of New Mexico, the defendant,

MISSISSIPPI POTASH, INC., and the defendant's counsel, Robert J. Gorence and Brian H.

Lematta:

## REPRESENTATION BY COUNSEL

1.      The defendant understands its right to be represented by an attorney and is so

represented. The defendant has thoroughly reviewed all aspects of this case with its attorneys

and is fully satisfied with that attorney's legal representation.

## RIGHTS OF THE DEFENDANT

2.      The defendant further understands its rights:

a.      to plead not guilty;

b.      to confront and cross-examine witnesses and to call witnesses in its

defense;



c.      against compelled self-incrimination; and,

d.      the right to limit restitution to the count of conviction.

## WAIVER OF RIGHTS AND PLEA OF GUILTY

3.      The defendant hereby agrees to waive these rights and to plead guilty to Count One of the three-count information charging violation of Title 16 U.S.C. §§ 703, 707(a), a strict liability misdemeanor, that being taking migratory birds without being permitted to do so by regulation.

## SENTENCING

4.      The defendant understands that the maximum penalty the Court can impose is:

a.      a fine not to exceed the greater of $15,000.00 or twice the pecuniary gain to the defendant or pecuniary loss to the victim;

b.      a mandatory special penalty assessment of $50.00;

c.      restitution as may be ordered by the Court, pursuant to law; and

d.      a period of probation not to exceed five years.

5.      The defendant has reviewed the application of the sentencing guidelines with its attorney and understands that they do not apply to the violation committed by the defendant.

6.      The parties jointly recommend to the court a fine amount of $15,000.

7.      The parties jointly recommend to the court a period of probation, with standard conditions, of five years, with the following special conditions of probation:

a.      The defendant, within 3 business days of sentencing must fund an escrow account, as described in Attachment A hereto, with $237,500.

2

b.      The defendant, within the first twenty-four months of its probation must complete remediation of Laguna Toston as set forth in Attachment B hereto, using the funds in the escrow account to do so, as provided in Attachment A.

8.      United States hereby expressly reserves the right to make known to the United States Probation Office, for inclusion in the presentence report prepared pursuant to Rule 32, Fed. R. Crim. P., any information that the United States believes may be helpful to the Court.

9.      The United States and the defendant understand that the above stipulations are not binding on the Court and that whether the Court accepts these stipulations is a matter solely within the discretion of the Court after it has reviewed the presentence report. The defendant understands and agrees that if the Court does not accept any one or more of the above stipulations, the defendant hereby waives the right to appeal the Court's rejection of such stipulations.

## DEFENDANT'S ADDITIONAL OBLIGATIONS

10.      The defendant understands its obligation to provide the United States Probation Office with truthful, accurate, and complete information. The defendant hereby represents that it has complied with and will continue to comply with this obligation.

11.      The defendant hereby agrees that:

a.      If requested to do so by the United States Attorney's Office at any time during the period of its probation, the defendant will provide all documents, records, writings, tangible objects, or materials of any kind that are in its possession or under its custody or control and that relate directly or indirectly to any area of inquiry or investigation in this proceeding.

3

b.      If requested to do so by the United States Attorney's Office at any time prior to sentencing, the defendant will submit a financial statement under oath and/or respond to questions by the United States Attorney's Office regarding its capacity to satisfy any fines and/or restitution.

## WAIVER OF APPEAL RIGHTS

12.      The defendant is aware that Title 18, United States Code, Section 3742 affords a defendant the right to appeal the sentence imposed.

a.      Acknowledging that, the defendant knowingly waives the right to appeal any sentence of conviction as determined by the court after resolution of any objections by either party to the presentence report to be prepared in this case, and the defendant specifically agrees not to appeal the determination of the court in resolving any contested sentencing factor. In other words, the defendant waives the right to appeal the sentence imposed in this case except to the extent, if any, that the court imposes a sentence above the statutory maximum or in violation of the law apart from the sentencing guidelines; provided, however, that if the government exercises its right to appeal the sentence imposed, as authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may appeal the sentence as authorized by 18 U.S.C. § 3742(a).

## GOVERNMENT'S AGREEMENT

13.      Provided that the defendant fulfills its obligations as set out above, the United States agrees that:

a.      The United States will move at the time of sentencing to dismiss the remaining counts of this information as to the defendant.

4

b.     The United States will not bring additional charges against the defendant arising out of the defendant's past conduct regarding the deaths of migratory birds at Laguna Toston prior to the date of the plea now known to the United States Attorney's Office for the District of New Mexico or the Environmental Crimes Section of the U.S. Department of Justice.

c.     If, during the period of probation established by the court, the defendant unintentionally causes a taking of one or more migratory birds at Laguna Toston, the United States agrees to exercise its discretionary authority not to prosecute the defendant criminally for such a taking provided that, in the sole judgment of the United States, the defendant (1) is and has been in full compliance with all terms of this plea agreement and all conditions of probation described herein, whether or not ordered by the court at sentencing, (2) the defendant provides timely notification to the USFWS of any such discovered or reasonably anticipated takings, and (3) the defendant responds in good faith and in consultation with the USFWS to correct or minimize such takings.

14.     This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

## VOLUNTARY PLEA

15.     The defendant agrees and represents that this plea of guilty is freely and voluntarily made and not the result of force or threats or of promises apart from those set forth in this plea agreement. There have been no representations or promises from anyone as to what sentence the Court will impose.

5

## VIOLATION OF PLEA AGREEMENT

16.     The defendant understands and agrees that if it violates any provision of this plea agreement before the time of entry of the judgment, the United States may declare this plea agreement null and void, and the defendant will thereafter be subject to prosecution for any criminal violation including, but not limited to, any crime(s) or offense(s) contained in or related to the information filed in this case, as well as perjury, false statement, and obstruction of justice.

## SPECIAL ASSESSMENT

17.     At the time of sentencing, the defendant will tender a money order or certified check payable to the order of the **United States District Court**, District of New Mexico, 333 Lomas Blvd. N.W., Suite 270, Albuquerque, New Mexico 87102, in the amount of $ 50.00 in payment of the special penalty assessment described above.

## CORPORATE DEFENDANT

18.     The undersigned corporate officer or representative of the defendant hereby certifies that he is authorized by the defendant corporation to act on its behalf, to plead guilty to the charge alleged in the Information, and to enter into this plea agreement, and that a corporate resolution so empowering said officer or representative has been duly made and approved by said corporation.

## FACTUAL BASIS

19.     Defendant is pleading guilty because defendant is in fact guilty. The defendant certifies that defendant does hereby admit that the facts set forth below are true, and were this case to go to trial, the United States would be able to prove those specific facts beyond a reasonable doubt:

6

a.    The defendant is incorporated in Mississippi and is involved in the production of fertilizers, including potash.

b.    At the time of the offense, Mississippi Potash produced potash fertilizer at two operating mines and refineries in Carlsbad, New Mexico.

c.    Mississippi Potash discharged waste products from some of its potash mining operations into a natural playa lake called Laguna Toston until February 2001.

d.    These waste products include significant amounts of sodium salts. Birds exposed to such high salinity waste water experience a high mortality rate.

e.    Between approximately September 29, 1998, and March 17, 2003, more than one migratory bird died at Laguna Toston from exposure to the high salinity waste water.

## ENTIRETY OF AGREEMENT

20.    This document is a complete statement of the agreement in this case and may not be altered unless done so in writing and signed by all parties.

AGREED TO AND SIGNED this ____ day of _____, 2004.

7

DAVID C. IGLESIAS
United States Attorney

*[signature]*

Mary Kay McCulloch
Assistant United States Attorney
201 Third Street N.W., Suite 900
Post Office Box 607
Albuquerque, New Mexico 87102
(505) 346-7274

*[signature]*

Elinor Colbourn
Senior Trial Attorney
Environmental Crimes Section
601 D St. NW
Washington, D.C. 20004
(202) 305-0205

I have read this agreement and carefully reviewed every part of it with my attorney. I understand the agreement and voluntarily sign it.

*[signature]*

Timothy A. Dawson
Vice President of Finance
Mississippi Potash, Inc.
Defendant

*[signature]*

Robert J. Gorence
Attorney for Defendant

*[signature]*

Brian H. Lematta
Attorney for Defendant

U.S. BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIP
FILED

AUG 2 6 2004

CHARLENE J. KENNEDY, CLERK
                        DEP'T

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

In re:                                  )
                                        )
MISSISSIPPI CHEMICAL                    )
    CORPORATION, et al. [1]             )          CASE NO. 03-02984 WEE
                                        )          Chapter 11
            Debtors.                    )          **Jointly Administered**
_____)

## ORDER APPROVING COMPROMISE WITH THE UNITED STATES

THIS CAUSE came before the Court on the filing by Mississippi Chemical Corporation,

*et al.*, debtors and debtors-in-possession in these jointly administered reorganization proceedings

(the "Debtors"), pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure, of their

Motion for Approval of Compromise with the United States (the "Motion"), which requests the

authority of the Court to enter into the Plea Agreement attached as Exhibit "A" to the Motion

that resolves a certain action pending in the United States District Court for the District of New

Mexico bearing Criminal Action No. CR 03-1941 JC (the "Proceeding"). The Court, having

considered the Motion, the premises and that no objections or other responses thereto were filed,

finds that the Motion is well taken and should be granted.

IT IS, THEREFORE, ORDERED that the Motion is granted in full;

IT IS FURTHER ORDERED that the Debtors are authorized and empowered to enter

into the Plea Agreement, which effectuates the remediation plan for Laguna Toston, in the form

attached as Attachment "B" to Exhibit "A" to the Motion, and to execute any and all documents

in connection therewith;

---

[1]      The Debtors are the following entities:  Mississippi Chemical Corporation; Mississippi Nitrogen,
Inc.; MissChem Nitrogen, L.L.C., Mississippi Chemical Company, L.P.; Mississippi Chemical Management

IT IS FURTHER ORDERED that the Debtors are authorized and empowered to enter into the Remediation Escrow Agreement described in the Motion and to execute any and all documents in connection therewith;

IT IS FURTHER ORDERED that Mississippi Chemical Corporation is authorized to pay into Escrow the amount of Two Hundred Thirty-Seven Thousand Five Hundred Dollars ($237,500) as described in Attachment "A" to Exhibit "A" to the Motion; and

IT IS FURTHER ORDERED that, upon entry of this Order, the Debtors are hereby authorized and empowered to execute and carry out the terms and conditions of any other documents necessary to resolve the Proceeding.

SO ORDERED this the 20th day of August, 2004.

Original Signed By
EDWARD ELLINGTON
US BANKRUPTCY JUDGE

_____

EDWARD ELLINGTON
United States Bankruptcy Judge

Company; Mississippi Phosphates Corporation; Mississippi Potash, Inc.; Eddy Potash, Inc.; Triad Nitrogen, L.L.C; and Melamine Chemicals, Inc.

# REMEDIATION PLAN

## FOR

## LAGUNA TOSTON

ATTACHMENT B

1   General:

Laguna Toston, located about 30 miles east of Carlsbad, New Mexico, was used for the disposal of tails and slimes from a nearby potash operation from the early 1970's until 2001. Early use was by Kerr-McGee Corporation, then owner of the nearby potash operation, in accordance with a Special Land-Use Permit issued by the Bureau of Land Management, United States Department of the Interior, effective August 7, 1970. The potash operation and disposal rights have changed hands several times since 1970. In 1996, the potash operation was acquired by Mississippi Potash, Inc., ("MPI") which abandoned permanent disposal of tails in early 2001.

Despite the cessation of disposal into Laguna Toston, brine remains within the Laguna and presents a hazard for migratory birds covered by the Migratory Bird Treaty Act. Mississippi Potash retained Water Management Consultants, Inc. ("WMC") to identify and evaluate mitigation measures, including measures aimed at eliminating the brine pool itself. WMC's Technical Memorandum dated February 23, 2004, was entitled "Analysis of Management Options for Laguna Toston."

The selected mitigation/remediation measure is to pump the brine from the pool (approximately 23 acres) and spread it over the adjoining salt flat (approximately 300 acres) for evaporation. The WMC analysis determined that a flow in the range of 450 to 1,500 gpm, depending on the time of year, could be evaporated from the salt flat. A pumping rate of 500 gpm would eliminate the brine pool in less than one year.

1.1   Overview

A pump will be installed in the deepest area of the pool near the present pump location. The electrical power will be supplied from the existing electrical service at the site. A six-inch (HDPE) high-density polyethylene pipeline of some 8,000 feet in length will connect to the pump and run east and then south along the edge of the Toston salt flat. Beginning at about 3,600 feet to the east, a portion of the brine flow (40 to 50 gpm) will be discharged every 400 feet for the remaining length of the line. This will disperse the brine over a large area of the salt flat to enhance evaporation.

The evaporation system will be designed to flow a minimum of 500 gallons per minute. Based on the report from Water Management Associates, this flow should eliminate the liquid pool in less than one year.

1.2   Installation Proposed

1.2.1   Pump – A pump will be installed in the deepest area of the pool near the present pump location. The electrical power will be supplied from the existing electrical service at the site. A freshwater supply will be available to flush lines and prevent the system from plugging with salt.

The existing Warman 4 by 3 pump will be refurbished and re-shieved to run at approximately 1700 RPM. At this speed, the pump will move 500 gpm of brine at 105 feet of head. A 40-hp motor will be installed on the pump.

1.2.2   Pipe System – From the pump discharge, 8,000 feet of six-inch diameter high-density polyethylene pipe SDR 32.5 will run east, then south along the Toston salt flat. (See Figure 5.4) After approximately 3,600 feet, a tee will be placed in the header; a tee will then be placed every 400 feet thereafter (12 places). Each tee will have a 2-inch valve that connects to another tee that will regulate the flow to the brine distribution piping. The distribution piping will be perforated pipe, each approximately 200 feet long adjacent to the header and connected to the second tee. These 200 foot pipe lengths will be positioned and, when combined with valves, will distribute and regulate the brine flow over the salt flat (See Figure 5.5).

The pipe system shall be located entirely within the boundaries of BLM Right of Way NM-12177. Prior to commencement of construction of the pipe system, MPI shall identify on the ground the boundaries of the ROW and the proposed pipe system location, and obtain written approval of the location from the BLM Carlsbad Field Office.

1.2.3   Instrumentation/Electrical – The electrical supply to the 40-hp motor will be supplied from the existing power source at Laguna Toston, which has been confirmed to be sufficient.

The instrumentation will consist of a flow meter to read the brine flow. A pump run time device will determine the pump operating time. From this data, the daily flow can be calculated. A gage board will be installed in the brine pool to determine pool level, which will be recorded on a daily basis.

2

Two stand pipe piezometers will be located as shown on Figure 5.4, approximately 10 to 15 feet deep to measure the water level beneath the salt crust.

1.3   Berm/Detention Basin – A berm and detention basin will be constructed upgradient to prevent storm runoff from entering the footprint of the tailings and salt flat areas. The berm will be constructed within the disturbed area of the salt flats and tailings area.

The berm will vary in height as required, but will generally be up to 8 feet in height and from 12 to 8 feet wide depending on the survey. The berm will be up to 10,000 feet long. It will begin near the end of the pipe system, will run south and west and will intersect the berm at the old tails disposal.

The berm is estimated to take 25,000 cubic yards of material from the tailing site adjacent to the berm.  The berm will be similar in size and shape to the present berm located near the old tails disposal discharge pipe (See Figure 5.4).

The berm shall be located entirely within the boundaries of BLM Right of Way NM-12177. Prior to commencement of construction of the berm, MPI shall identify on the ground the boundaries of the ROW and the proposed berm location, and obtain written approval of the location from the BLM Carlsbad Field Office.

1.4   System Operation – The system will operate on a continuous basis 24-hours per day, 365 days a year, except for necessary maintenance and operational outages.  MPI will provide or arrange for an operator to check pump operation daily, make adjustments to flow distribution and record instrument readings.

1.5   Provision relating to protection of culture resources – Because a Class III Cultural Inventory was never completed for the BLM land within right-of-way NM-12177, all disturbance, especially that associated with the berm, will be confined as much as possible to the usage of the existing tailings. The depth of disturbance when constructing the berm is not to exceed the original ground surface which existed prior to the deposition of the tailings within BLM Right-of-way NM-12177 except in those areas where the depth of the tailings is not sufficient to allow construction of the berm as proposed. In those areas where the tailings deposit is not sufficient for construction of the berm and material must be used from below the original ground surface, an archaeological monitor must be utilized per the Archaeological stipulations provided below in 1.8

3

Anticipated Schedule

Project Installation

| | Time | Duration |
|---|---|---|
| Project Approval | Day 1 | - |
| Purchase Material | Week 1 | 1 Wk. |
| Bid Package Out | Week 2 | 2 Wks. |
| Award Contract | Week 6 | 4 Wks. |
| Material Delivery | Week 6 | 5 Wks. |
| Start Construction | Week 7 | - |
| Complete Construction | Week 17 | 10 Wks. |
| Start-up | Day 120 | 1 Day |

Total Installation Duration – 120 Days

The system should be operational 120 days, or approximately 4 months, from project approval.

- Brine enhanced evaporation begun – 4 Months from approval
- Brine evaporation completed – 12 – 16 months from approval
- The effectiveness of the evaporation project will be evaluated on an ongoing basis, and adjustments will be made as necessary.

1.6    Project Completion – The project will be deemed completed, and operation of the pumping system may be permanently terminated as soon as (1) the liquid pool at Laguna Toston is eliminated through operation of the system described above, save for ephemeral accumulation not to exceed 0.3 ft. of water over a 3-acre area standing for not more than a month; and (2) subsequent weekly monitoring (consisting of at least one circuit of the Laguna area on foot) during a migration season (August through November) is completed and the results reported to and approved by an authorized representative of the U.S. Fish and Wildlife Service.

1.7    Interim Hazing – Until the project is complete (that is, the liquid pool at Laguna Toston is eliminated through operation of the system described above, save for ephemeral accumulation not to exceed 0.3 ft. of water over a 3-acre area standing for not more than a month), defendant will conduct scheduled patrols of Laguna Toston to monitor migratory bird use, haze any observed migratory bird on the surface of the Laguna, and use its best efforts to rescue any disabled migratory bird (for which purposes it shall maintain its special use permit to collect, rehabilitate and release migratory birds). This commitment shall include one patrol (that is, circuit) of the shoreline of Laguna Toston by boat, vehicle, foot or a combination of the three, to occur within one hour of dawn and a second patrol to occur within one hour of dusk during the migration periods of March 15 to May 31 and October 15 to December 31, which periods shall be extended when the actual migration season is extended. At all other times of the year the commitment shall include one patrol, as described above: (1) at least once daily following any observed mortality of a migratory bird until the likelihood of additional mortalities can reasonably be determined to have subsided; and (2) as soon as possible, considering the safety of personnel, following storm or other events that may disable migratory birds on the Laguna. Finally, at any time that does not require patrols as set forth above, defendant's designated environmental manager shall, whenever he is at his normal workplace, or his

designee when he is not at his workplace, on at least three non-consecutive days each week and within one hour of dawn or one hour of dusk, inspect Laguna Toston and its entire shoreline from a vantage point from which the entire Laguna is visible, using binoculars. If defendant determines that Laguna Toston no longer poses a threat to migratory birds, prior to the completion of the project, it may request permission from the USFWS to cease hazing activities, which decision shall be in the USFWS's discretion.

1.8     Site Protection and Employee Education -- All employees of the project shall be informed that cultural sites are to be avoided by all personnel, personal vehicles and company equipment. They shall also be notified that it is illegal to collect, damage or disturb cultural resources.

1.9     Archeological Monitoring and Reporting

   1.9.1   A copy of these stipulations shall be supplied to the archaeological monitor at least five (5) working days prior to the start of construction activities.

   1.9.2   No construction activities may begin before the arrival of the archaeological monitor in all areas exceeding the depth of the original tailings.

   1.9.3   The archaeological monitor will monitor all areas where the tailings are of insufficient depth for construction of the berm and as a result, additional material must be obtained from below the original ground surface, and submit a report of the monitoring activities within thirty (30) days of completion of monitoring unless other arrangements are made with the BLM. These stipulations must be attached to the report.

2.0     Cultural Resources -- If Cultural Resources (as that term is defined in the glossary of terms for BLM Manual 8100, Cultural Resource Management) are encountered at any time during the berm construction or other surface disturbance, work is to stop immediately in that specific area and a BLM archaeologist is to be notified within 24 hours. Work cannot resume within 100 feet of the cultural resource encountered area until approval by BLM archaeologist.

#116477.01
Attachments



3HRL01_.TIF

PC Docs 116597 (Figure 5.5)



3HRJ01_.TIF

PC Docs 116595 (Figure 5.4)



3HRY01_.TIF

PC Docs 116594 (Figure 2.1)



Figure 2.1   Laguna Toston drainage basin





| Figure 5.4 | Schematic of enhanced evaporation system and monitoring locations |



EXPLANATION

◆ Stand pipe piezometers
   (Approximate proposed locations)

● Barge pump

— 6-inch diameter HDPE header pipe
   (Approximate proposed location)

— 4-inch diameter perforated
   HDPE or ABS lateral pipe
   (Spacing and length to
   be determined)

0    650   1300

Scale in Feet



3600' FROM
PUMP DISCH.

400'-0"

6"∅ HDPE
HEADER PIPE

4"∅ PERFORATED
HDPE PIPE
200' LG.

PLAN

6"x2"
REDUCING
TEE

2" HDPE
BALL VALVE

CLAMP

4"∅ PERFORATED
HDPE PIPE
200' LG.

4"x2"
REDUCING
TEE

4"∅ PERFORATED
HDPE PIPE
200' LG.

ENLARGED PLAN
TYP. (12) PLCS.

| REV. | DESCRIPTION | DRN APP CHK DATE | SCALE: NONE | MISSISSIPPI CHEMICAL CORP. |
|------|-------------|------------------|-------------|-----------------------------|
| 0 | NEW DRAWING | | DATE: 03/08/04 | YAZOO CITY, MISSISSIPPI |
| | | | DRN. BY: DWG | |
| | | | CHKD BY: | DWG. No. FIGURE 5.5     REV. 0 |

**REMEDIATION ESCROW AGREEMENT**

THIS REMEDIATION ESCROW AGREEMENT ("Escrow Agreement") is made and entered into as of _____-_____, 2004, by and among Mississippi Potash, Inc. ("Potash"), a Mississippi corporation, Mississippi Chemical Corporation ("MCC"), a Mississippi corporation, and AMSOUTH BANK, an Alabama corporation with an office in Jackson, Mississippi (the "Bank").

**W I T N E S S E T H :**

WHEREAS, Potash and the United States Attorney for the District of New Mexico have entered into a Plea Agreement dated as of _____, 2004, (the "Plea") to be presented for approval to the District Court of the United States for the District of New Mexico ("District Court") in Criminal Case No. 03-1941 JC.

WHEREAS, on May 15, 2003, Potash, MCC and eight (8) related entities filed voluntary petitions to reorganize under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Mississippi, Jackson, Mississippi, (the "Bankruptcy Court") the cases being administered jointly in Joint Case Number 03-02984 WEE.

WHEREAS, in the Plea, Potash agreed to execute a certain plan of remediation at Laguna Toston, New Mexico, all as more particularly described in Exhibit A attached to the Plea and incorporated therein (the "Project").

WHEREAS, Potash lacks the funds and personnel necessary to execute the Project, and MCC has agreed to make available $ 237,500.00 for such purpose.

WHEREAS, Potash and MCC have agreed to establish with the Bank an interest-bearing escrow account for the funds with which Potash shall execute the Project.

WHEREAS, Potash and MCC have requested Bank to act in the capacity of escrow agent under this Escrow Agreement, and Bank, subject to the terms and conditions hereof, has agreed so to do.

NOW, THEREFORE, in consideration of the premises and mutual covenants and agreements contained herein, the parties hereto hereby agree as follows:

1.    **Appointment of Escrow Agent; Annual Fee.**

(a)    Appointment. Each of Potash and MCC hereby appoints the Bank as the escrow agent under this Escrow Agreement (the Bank in such capacity, the "Escrow Agent"), and Escrow Agent hereby accepts such appointment.

(b)    Annual Fee.  The Escrow Agent shall receive an annual fee in the amount of $1200.00 ("Annual Fee").

ATTACHMENT A

2.    **Escrow Fund**.  Within five (5) business days of the last to occur of (a) execution of this Escrow Agreement, (b) the entry of an order by the Bankruptcy Court approving this Escrow Agreement and (c) the entry of an order by the District Court approving the Plea, MCC will deliver to the Escrow Agent the sum of $ 237,500.00 (as said sum may increase or decrease as a result of the investment and reinvestment thereof, by charges thereto and payments and setoffs therefrom pursuant hereto, the "Escrow Fund") to be held by Escrow Agent in accordance with the terms hereof. Earnings on the Escrow Fund shall be credited to MCC.

3.    **Investment of the Escrow Fund**.  The Escrow Fund shall be invested, and the earnings thereon shall be reinvested, in the AmSouth Bank Master Money Market Account.

4.    **Disbursement of Escrow Fund**.  Escrow Agent is hereby authorized and instructed to make disbursements from the Escrow Fund only as follows:

(a)    in accordance with Potash's written instruction to send payment to a payee identified in the instruction if, and only if, such instruction is accompanied by the certification of Potash's Corporate Secretary that Potash is obligated to such payee in connection with the Project and that the U.S. Fish and Wildlife Service has been notified in writing of this obligation and has either concurred in the payment or failed to object to the payment within 30 days of receiving the written notice;

(b)    upon receipt of Potash's written instruction to reimburse Potash for its payment to an identified party if, and only if, such instruction is accompanied by the certification of Potash's Corporate Secretary that Potash made such payment in connection with the Project and that the U.S. Fish and Wildlife Service has been notified in writing of this obligation and has either concurred in the payment or failed to object to the payment within 30 days of receiving the written notice;

(c)    upon the funding of the Escrow Fund, the Annual Fee to Escrow Agent;

(d)    upon the anniversary of the funding of the Escrow Fund, the Annual Fee to Escrow Agent, if the Escrow Fund has not theretofore been terminated in accordance herewith;

(e)    to a court of competent jurisdiction in accordance with Section 5 hereof; and

(f)    upon termination of this Escrow Agreement, in accordance with Section 9 below;

provided, however, in the event that Potash is dissolved or merged into another entity, MCC shall provide notice thereof to Escrow Agent, and thereafter MCC shall be substituted for Potash in (a) and (b) above as the party authorized to provide instructions hereunder.

5.    **Disputed Payment**

In the event of a dispute as to the disposition and release of all or a part of the Escrow Fund, which dispute cannot be resolved by agreement, the Escrow Agent may, at its option, refuse to comply with any disputed instruction, commence an action in the nature of an interpleader and deposit the disputed portion of the Escrow Fund with a court of competent jurisdiction for disposition.

6.     **Rights, Privileges, Immunities and Liabilities of Escrow Agent**

(a)     <u>Depository Only</u>.  The Escrow Agent is not a party to and is not bound or charged with notice of any other agreement out of which this escrow arises and acts hereunder as a depository only.  Except in the event of a loss occasioned by gross negligence or willful misconduct, the Bank is not responsible or liable in any manner whatsoever for the sufficiency, correctness, genuineness or validity of any document, instrument, certificate, check or agreement or for the identity or authority of any person executing or depositing the same, and may assume any person purporting to give any written notice, advice or instruction in connection with the provisions hereof has been duly authorized to do so.  The Escrow Agent's only duty, liability and responsibility shall be to hold the property as herein directed, to invest same in the AmSouth Bank Master Money Market Account and to pay and deliver the same to such persons and under such conditions as are herein set forth.

(b)     <u>Indemnity</u>.  MCC hereby agrees to indemnify and save Escrow Agent harmless from all loss, cost, damages, expense and attorney's fees suffered or incurred by it as a result of any action or inaction taken or failed to be taken by Escrow Agent in connection herewith, other than losses, costs, damages, expenses and attorney's fees resulting from the Escrow Agent's gross negligence or willful misconduct.  All protections and indemnities contained in this Escrow Agreement benefiting the Escrow Agent shall survive this Agreement.

(c)     <u>Actions Protected</u>.  The Escrow Agent shall be protected in acting on any written notice, instruction, request, waiver, consent, certificate, receipt, authorization, power of attorney or other paper or document which the Escrow Agent in good faith believes to be genuine and issued in accordance with this Escrow Agreement.  The Escrow Agent shall not be liable for anything which it may do or refrain from doing in connection herewith, provided that it acts in good faith.

(e)     <u>Resignation</u>.  The Escrow Agent, or any successor to it hereafter appointed, may resign by giving thirty (30) days prior notice in writing to MCC and shall be discharged from its duties hereunder upon the appointment of a successor Escrow Agent.  Any successor Escrow Agent shall deliver to MCC a written instrument accepting the appointment hereunder, and thereupon it shall succeed to all the rights and duties of the Escrow Agent hereunder and shall be entitled to receive all of the Escrow Fund then held by the predecessor Escrow Agent hereunder.

7.     **Notices**

Any notice, instruction or other communication required or permitted to be given under this Escrow Agreement by any party hereto to any other party hereto shall be considered as properly given if in writing and (a) delivered against receipt therefor, (b) sent by facsimile with confirmation of receipt, or (c) scanned and e-mailed with confirmation of receipt, in each case to the address, fax number, or e-mail address, as the case may be, set forth below:

**If to Escrow Agent:**
AmSouth Bank
210 East Capitol Street, 8th Floor
Jackson, MS 39201
Attn: Penny W. Hale
Telephone No.: 601/354-8111
Fax No.: 601/968-4726
E-Mail: penny.hale@amsouth.com

**If to Potash:**
Mississippi Potash, Inc.
P.O. Box 1914
3622 Highway 49 East
Yazoo City, Mississippi 39194
Attention: Corporate Secretary
Telephone No.: 662/746-9457
Fax No.: 662/746-9158

**If to MCC:**
Mississippi Chemical Corporation
P.O. Box 388
3622 Highway 49 East
Yazoo City, MS 39194-0388
Attention: Corporate Secretary
Telephone No.: 662/751-2934
Fax No.: 662/751-2912
E-Mail: CorpSec@misschem.com

**If to U.S. Fish and Wildlife Service:**
Resident Agent-in-Charge
4901 Paseo del Norte NE, Suite D
Albuquerque, New Mexico 87113
(505) 346-7828

Any party to this Escrow Agreement or otherwise entitled to notice or instructions or copies of notice or instructions hereunder may change the address to which communications hereunder are to be directed by giving written notice in accordance herewith to the other parties listed in this Section 7. All signatures of the parties to this Escrow Agreement and of parties issuing notices and instructions hereunder may be transmitted by facsimile or by e-mail of a scanned document, and such facsimile or scanned document will, for all purposes, be deemed to be the original signature of the party whose signature it reproduces and will be binding upon such party.

8.    **General**

(a)    Amendment.  This Escrow Agreement may not be altered, amended, revised or modified, in whole or part, except by written agreement signed by all of the signatory parties

hereto and approved by the U.S. District Court pursuant to United States v. Mississippi Potash, Inc., No. 03-1941.

(b)   Counterparts. This Escrow Agreement and any instruction, certificate, instrument, notice or other document required to be provided hereunder may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute but one and the same instrument, provided, however, that this Escrow Agreement shall not take effect until it has been signed by all parties and the Escrow Fund has been delivered to the Escrow Agent.

(c)   Severability, Assigns. If one or more of the provisions hereof shall for any reason be held to be invalid, illegal or unenforceable in any respect under applicable law, such invalidity, illegality or unenforceability shall not affect any other provisions hereof, and this Escrow Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein, and the remaining provisions hereof shall be given full force and effect. This Escrow Agreement shall be binding upon and inure to the benefit of the parties hereto and their successors, heirs and assigns.

(d)   Choice of Laws. This Escrow Agreement shall be construed under, and governed by, the laws of the State of Mississippi, excluding, however, its choice of law rules. The parties hereto agree that the forum for resolution of any dispute arising under this Escrow Agreement shall be Bernalillo County, New Mexico, and each such party hereby consents, and submits itself, to the jurisdiction of the U.S district court sitting in Bernalillo County, New Mexico.

9.   **Termination**

(a)   Discharge. When the Escrow Agent shall have delivered all of the Escrow Fund pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be ipso facto discharged from any further obligation hereunder, without the necessity of any formal documentation.

(b)   Termination. This Escrow Agreement shall terminate upon the earlier of (i) disbursement of the Escrow Fund in full in accordance with Section 4 hereof or (ii) disbursement to MCC (or upon MCC's instruction) of any amount remaining in the Escrow Fund, within three (3) business days following Escrow Agent's receipt of written notice from MCC including written concurrence of an authorized representative of the U.S. Fish and Wildlife Service or the U.S. District Court pursuant to United States v. Mississippi Potash, **Inc.,** that the Project has been completed.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, this Escrow Agreement is executed as of the _____ day of _____, 2004.

MISSISSIPPI CHEMICAL CORPORATION        AMSOUTH BANK

By:_____        By:_____
Typed Name: Larry W. Holley                          Typed Name:_____
Title: Sr. Vice President and C.O.O.                    Title:_____

MISSISSIPPI POTASH, INC.

By:_____
Typed Name: Timothy A. Dawson
Title: Vice President of Finance



M I S S I S S I P P I    C H E M I C A L    C O R P O R A T I O N

Owen Cooper Administration Bldg.    Highway 49 East    P.O. Box 388    Yazoo City, MS 39194    662-746-4131    FAX 662-746-9158    www.misschem.com

To Whom It May Concern:

Mississippi Chemical Corporation, through its undersigned duly authorized officer, asserts and certifies that it is aware that the Sixth Amendment to the Constitution of the United States provides that in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial. The District also is aware that Rule 48(b) of the Federal Rules of Criminal Procedure provides that the Court may dismiss an indictment, information or complaint for unnecessary delay in presenting a charge to the Grand Jury, filing an information or in bringing a defendant to trial. The District is further aware that for violations of the Migratory Bird Treaty Act, 16 U.S.C. § 703 et seq. ("MBTA"), the relevant statute of limitations is five (5) years. 18 U.S.C. § 3282 ("... no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed.").

Mississippi Chemical Corporation and the United States are negotiating a resolution of various alleged violations of the MBTA, in relation to bird mortality that occurred at and near Laguna Toston, New Mexico, as charged in *United States v. Mississippi Potash, Inc.*, No. 03-1941. As part of the anticipated resolution of that case, Mississippi Chemical Corporation hereby requests that the United States Attorney for the District of Arizona and the Environmental Crimes Section of the U.S. Department of Justice defer any criminal prosecution of Mississippi Chemical Corporation and seek a voluntary dismissal without prejudice of the pending charges against Mississippi Chemical Corporation to allow for completion of this anticipated resolution, including the completion of the remediation plan being funded by Mississippi Chemical Corporation, attached hereto. In light of this request, Mississippi Chemical Corporation hereby knowingly, voluntarily and deliberately waives its right to raise Sixth Amendment speedy trial issues, Rule 48 delay issues or the statute of limitations in defense to any prosecution brought by the United States Attorney for the District of New Mexico and/or the Environmental Crimes Section of the U.S. Department of Justice for alleged violations of the MBTA in relation to bird mortality that occurred at and near Laguna Toston, New Mexico, as charged in *United States v. Mississippi Chemical Company*, No. 03-1941, provided that such prosecution is re-initiated, by indictment or information, within one years after the completion of the attached remediation plan. Mississippi Chemical Company agrees and consents that any delay from the date of this waiver to the date of the initiation of any such prosecution shall be deemed to be a necessary delay at the request of Mississippi Chemical Corporation and the Corporation waives any defense

We make things grow®

to such prosecution on the ground that such delay operated to deny its rights under law, including but not limited to Rule 48(b) of the Federal Rules of Criminal Procedure and its right to a speedy trial under the Sixth Amendment to the Constitution of the United States.

Executed this 14th day of September, 2004.

*Timothy A. Dawson*

Timothy A. Dawson
Sr. Vice President and Chief Financial Officer
Mississippi Chemical Corporation

9/14/04

Date

Notarized:

*Linda G. Bentley*
*Notary Public*

My Commission Expires
May 20, 2005

**CONSENT TO ACTION**
**OF THE BOARD OF DIRECTORS OF**
**MISSISSIPPI POTASH, INC.**

The undersigned (the "**Directors**"), being all of the directors of Mississippi Potash, Inc. (the "**Company**"), a Mississippi corporation, acting pursuant to Section 79-4-8.21 of the Mississippi Business Corporation Act, do hereby consent to, approve, and adopt the following resolutions:

**WITNESSETH**

WHEREAS, the Company has been served with a three-count Superceding Information ("**Information**") in the United States District Court for the District of New Mexico ("**District Court**"), charging, inter alia, a violation of 16 U.S.C. §§ 703 and 707(a), a strict liability misdemeanor, that being taking migratory birds in the Laguna Toston, New Mexico ("**Laguna Toston**") without being permitted to do so by regulation, which Information bears No. CR-03-1941 JC (the "**Criminal Case**"); and

WHEREAS, after diligent and good faith negotiation the Company and the United States Attorney for the District of New Mexico have proposed to enter into a Plea Agreement in the Criminal Case, (the "**Plea Agreement**") to be presented for approval to the District Court; and

WHEREAS, under the terms of the Plea Agreement a remediation plan for Laguna Toston will be effected (the "**Remediation Plan**"), which plan is attached to the Plea as Attachment "B," funding for which will be held in escrow pursuant to an escrow agreement to be entered into among the Company, the Company's parent, Mississippi Chemical Corporation and AmSouth Bank (the "**Remediation Escrow Agreement**"), attached to the Plea as Attachment "A."; and

WHEREAS, the Directors have reviewed the Plea Agreement and its attachments and consulted with counsel;

NOW, THEREFORE, BE IT RESOLVED, that after review of the Plea Agreement and its attachments, and consultation with counsel, the Directors hereby freely, knowingly and willingly authorize and approve the Plea Agreement, the Remediation Plan and the Remediation Escrow Agreement on behalf of the Company and the performance of the obligations of the Company thereunder, all on the terms and conditions described in the Plea Agreement and its attachments or as may otherwise be directed by the District Court; and be it further

RESOLVED, that each officer and director of the Company is hereby authorized, empowered, and directed, in the name and on behalf of the Company, to (a) execute and deliver for and on behalf of the Company (i) the Plea Agreement and its attachments, (ii) any and all instruments, certificates, agreements and documents as the District Court may require or such officer or director shall deem necessary or appropriate in connection with the Plea Agreement and attachments, and (iii) any amendments, modifications, or supplements to any of the foregoing, and (b) to do and perform such further acts and things that may be necessary or appropriate to comply with, or evidence compliance with, the terms, conditions, and provisions of the Plea Agreement and its attachments; and be it further

124296.jmf                                    1.

RESOLVED, that the directors freely, knowingly, and willingly authorize Robert Gorence, of Robert Gorence & Associates P.C., and/or Brian Lematta, of Rodey, Dickason, Sloan, Akin & Robb, P.A. (collectively, the "**Attorneys**"), for and on the Company's behalf, to appear for the Company at the hearing, and any continuances thereof, to enter the Company's plea under the Plea Agreement, to change the Company's prior plea with the District Court, and to otherwise respond to questions from the District Court for and on behalf of the Company; and be it further

RESOLVED, that the Company has consulted with the Attorneys regarding the Plea Agreement and the Company is satisfied with the representation provided by the Attorneys with respect thereto; and be it further

RESOLVED, that any act or deed of any officer or director of the Company taken before the effective date of these resolutions that would be authorized by these resolutions if taken after the adoption hereof is hereby approved, ratified, and confirmed as the act and deed of the Company.

[Signature Page Follows]

CONSENT TO ACTION
OF THE BOARD OF DIRECTORS OF
MISSISSIPPI POTASH, INC.

SIGNATURE PAGE

Dated:  August 24, 2004.

_____
Joe A. Ewing

_____
J. Michael Bertram

_____
Carl R. Wallace



M I S S I S S I P P I   P O T A S H ,   I N C.

Highway 49 East   P.O. Box 1914   Yazoo City, MS 39194-1914   662-746-9457   FAX 662-746-9158   www.misspotash.com

August 26, 2004

Mr. Brian H. Lematta
Attorney at Law
Rodey, Dickason, Sloan, Akin & Robb, P.A.
201 3rd Street NW, suite 220
Albuquerque, New Mexico 87102

Re:     Laguna Toston Consent to Action

Dear Mr. Lematta:

Please find enclosed an original Certificate of Secretary of Mississippi Potash, Inc. regarding the Laguna Toston Consent to Action and a copy of the Consent itself.

Please call if you have any questions.

Sincerely,

Sarah Deal
Assistant to Corporate Secretary

/spd
Enclosure

We make things grow®

CERTIFICATE OF SECRETARY

OF

MISSISSIPPI POTASH, INC:

I, JOHN M. FLYNT, do hereby certify that I am the duly elected, qualified, and acting Corporate Secretary of Mississippi Potash, Inc. (the "Company"), a corporation duly organized and existing under the laws of the state of Mississippi; that as Corporate Secretary I have custody of the Company's records and its corporate seal; that the attachments are true and correct copy of a resolution duly adopted pursuant to a Consent to Action of the Board of Directors of the Company on August 24, 2004; that said resolutions are set forth in the Minute Book of the Company; that said resolutions do not in any manner contravene the Articles of Incorporation or Bylaws of the Company; and that said resolutions have not been in anywise amended, annulled, rescinded or reversed, and on the date hereof is still in full force and effect.

IN WITNESS WHEREOF I have hereunto set my hand and the seal of the Company this 26th day of August, 2004.

_John M. Flynt_

John M. Flynt, Corporate Secretary
MISSISSIPPI POTASH, INC.

(CORPORATE SEAL)

124345.spd